# EXHIBIT B

# Deposition of Daniel Brown

Streeter and Bryant v Sheriff and County

08 CV 732

1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

KIM YOUNG, RONALD JOHNSON )
and WILLIAM JONES,        )
                          )
         Plaintiffs       )
                          )
    -vs-                  )  No.  06 CV 552
                          )
COUNTY OF COOK, et al,    )
                          )
         Defendants.      )

     Deposition of DANIEL BROWN taken before JULIE A. ENRIGHT, C.S.R, R.P.R., and Notary Public, pursuant Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, at Suite 100, 312 North May Street, Chicago, Illinois, commencing at 10:44 a.m. on the 25th day of October, A.D. 2006.

EXHIBIT B

Daniel Brown     October 25, 2006

2 (Pages 2 to 5)

**Page 2**

```
 1    There were present at the taking of this
 2  deposition the following counsel:
 3     LOEVY & LOEVY by
        MR. MICHAEL KANOVITZ
 4     312 North LaSalle Street
        Suite 100
 5     Chicago, Illinois 60607
        (312) 243-5900
 6
           on behalf of the Plaintiffs;
 7
       QUERREY & HARROW by
 8       MR. DANIEL F. GALLAGHER
         175 West Jackson Boulevard
 9       Suite 1600
         Chicago, Illinois 60604
10       (312) 540-7674
11         on behalf of Defendant;
12       ASSISTANT STATE'S ATTORNEY
         MR. FRANCIS J. CATANIA
13       500 Richard J. Daley Center
         Chicago, Illinois 60602
14       (312) 603-6572
15         on behalf of Defendant.
16                -----
```

**Page 3**

```
          DEPOSITION OF
          DANIEL BROWN

         October 25, 2006

EXAMINATION BY:              PAGE

Mr. Michael Kanovitz           4
                             249
Mr. Daniel F. Gallagher      243
Mr. Francis J. Catania       244
          * * * * *
          EXHIBITS
                             PAGE
Exhibit No. 1                100
Exhibit No. 2                147
Exhibit NO. 3                148
          * * * * *
```

**Page 4**

1                 DANIEL BROWN,
2   called as a witness herein, having been first duly
3   sworn, was examined upon oral interrogatories and
4   testified as follows:
5                 EXAMINATION
6       by Mr. Kanovitz:
7     Q   Good morning. Can you state and spell your
8   name?
9     A   Daniel Brown D-a-n-i-e-L.
10   Q   You're employed by the Cook County Sheriff?
11   A   Yes, sir.
12   Q   What is your position?
13   A   Superintendent.
14   Q   Is the title just superintendent?
15   A   Well, I am superintendent over records,
16   receiving, classification, and trust.
17   Q   So superintendent over records, receiving --
18   A   Classification and trust. It is only
19   partially trust. We don't have anything to do with
20   the money, just the property.
21   Q   Let's break those down. What does records
22   refer to?
23   A   Records is the -- records that we hold -- is
24   the records that we hold for every detainee that is

**Page 5**

1   actively inside the Cook County of Corrections.
2   Q   Would those be records that the Sheriff's
3   Department itself generates?
4   A   No. Normally, the only records that are
5   kept in that pack -- some of it is. There is a
6   history card that we generate. Everything else in
7   the records pack comes from the courts as
8   documentation as to remanding them into our custody
9   and bringing them back and forth to court.
10   Q   Does that include like computerized records
11   that the Sheriff's Department would generate?
12   A   No.
13   Q   Do you know who is in charge of the data
14   bases that the Sheriff's Department generates?
15   A   I believe that would be Andy Krock.
16   Q   Can you spell that?
17   A   I'm not sure. I think it is K-r-o-c-k.
18   Q   Okay. Then receiving?
19   A   Receiving is -- it takes on a lot of
20   different functions. It is basically RCDR which
21   encompasses the classification department as well
22   and trust department. Basically what happens is
23   they are responsible for the movement of all
24   detainees throughout the facility. We are

Daniel Brown          October 25, 2006

48 (Pages 186 to 189)

186

1  told to squat and cough and they were previously
2  told to bend over and spread?
3    A  There is two other things. They are told
4  when they are standing in front, to open their
5  mouths and sticks their tongues out. And when they
6  squat and cough, to run their fingers through their
7  hair. At one time they were told to bend over at
8  the waste and grab their cheeks. Now, after they
9  cough they are told to run their fingers through
10 their hair. That is the only difference.
11   Q  So the group is instructed to strip and
12 place their clothes on the yellow line?
13   A  Correct.
14   Q  In terms of the part where they have to open
15 their mouth and wiggle their fingers and run their
16 hands through their hair is that done one by one, or
17 is that done --
18   A  As a group.
19   Q  Okay. Is there a certain ratio that is
20 required of guards while that is going on?
21   A  No.
22   Q  In situations where there is a large ratio
23 of strip searchees to guards does that process vary
24 at all?

187

1    A  No, what it is going to do is you are going
2  to look at your area of guys that you are going to
3  be responsible for searching and you may have to
4  walk from over here to over here and it takes
5  several seconds just to walk down as they are doing
6  this to make sure nothing is falling out, nothing.
7  You are -- it is just a visual thing for the
8  officer. So he is just looking for anything that
9  looks unusual to him.
10   Q  How long did you say the hallway was and
11 this is your estimate?
12   A  I think I would say the hallway is 150 feet,
13 something like that. I can't recall exactly what I
14 said. I think it is about 150 feet or so.
15   Q  Unless you got somewhere between 15 and 30
16 guards there you are not going to have eye contact
17 with each person while they are opening their mouth
18 and lifting their tongue?
19   A  You may not. You may not see everything.
20 You may not.
21   Q  So, for example, you said the most you have
22 ever seen was 25 guards but that was --
23   A  Yes. Usually it is four or five officers
24 doing, you know, a group, an entire group and it

188

1  could be anywhere up to 80. But usually it is less
2  than that.
3    Q  80 would take up the whole hallway?
4    A  Yes, I have seen about 80 there.
5    Q  So how do the guards know that the person
6  that stuck their tongue out, you know, actually did
7  it, that everybody actually did --
8    A  They are watching their area and everybody
9  is doing this in unison as it goes along. They want
10 to get done with it. They normally listen.
11 Sometimes we have problems, but normally they are
12 going to listen and do what they have to do. They
13 want to the put their clothes back on. So we are
14 going to finish the process. They are going to do
15 that and, you know, it is done in unison.
16   Q  What kind of problems have you had to slow
17 it down?
18   A  We have detainees that don't want to do it
19 and that don't want to do what we ask them to do.
20 They become a disciplinary issue just.
21   Q  That don't want to strip or don't want to --
22   A  Don't want to undergo the strip search.
23 They don't want to do what we ask them to do,
24 something to that nature.

189

1    Q  Do you ever encounter problems only when you
2  reach the point of bend and spread?
3    A  I can't ever recall them not doing that or
4  not having anybody that said they were not going to
5  do it or not doing it. I don't ever recall anybody
6  giving us a problem with that.
7    Q  Ever heard a guard make any sort of teasing
8  or derogatory remark while this is going on?
9    A  I think when I was an officer I may have.
10 But I don't recall exactly what was said but, you
11 know, I can't say honestly throughout the years that
12 I have never heard that. I know as a supervisor I
13 have never heard it.
14   Q  They wouldn't do it around you?
15   A  I would hope not. I have never heard it. I
16 believe that we do a professional job and I don't
17 believe that is going on.
18   Q  I understand. I take it that you have never
19 had to discipline anybody for doing that?
20   A  I personally have never had to discipline
21 anybody for doing that. I don't know of anybody who
22 has been disciplined for doing that.
23   Q  You never heard of any discipline being
24 weeded out for behaving unprofessional during a

**198**

1  that they would still have on their person?
2    A  They may have belts at this point but
3  usually the courts confiscate the belts now and they
4  are in the property and we don't go into their
5  property to retrieve a belt. Shoelaces, stuff like
6  that they may or may not have them at that time. If
7  they have a belt, we are going to let them have that
8  with their pants and put it on. A belt would
9  definitely be laying on a line at that point in
10 time.
11   Q  What happens if while the shoes are being
12 searched, someone does turn around just to see what
13 is going on?
14   A  I don't have a problem with them turning
15 around and looking although we tell them to keep
16 facing the wall. We can only give them instructions
17 to do what we want them to do. You are talking if I
18 have got 45 men standing on the wall, these are men
19 that are going to do what they want to do but they
20 are -- it is a controlled situation. So we have to
21 give them very stern instructions, stay on the wall,
22 turn your head, and face the wall. Because it is a
23 safety issue for us. We are not going to allow them
24 to do something that we don't want them to do. If

**199**

1  they come off the wall, it is a whole different
2  issue. We are going to instruct them to turn back
3  around, you don't need to watch what I'm doing. You
4  know, basically that is it.
5     MR. CATANIA: Can we take a break?
6     MR. KANOVITZ: Just one last question.
7    Q  Back in the time frame where you are doing
8  the bend over and spread I take it there would have
9  been instruction before to turn around and face the
10 wall?
11   A  Oh, yeah, you would have to do that, right.
12 That is part of it. That would have been part of
13 it.
14   Q  Would that have been the last instruction or
15 the first instruction of that series of
16 instructions?
17   A  I am a little bit confused. If I was going
18 through the process again -- I can go through it
19 real quick with you. As far as turn around, face
20 the wall, reach up on the wall as high as you can,
21 spread your fingers, lift you right foot, left foot,
22 take a step back from the wall, bend over grab your
23 cheeks, you know, cough after they have coughed, run
24 your fingers through your hair as you are bent over,

**200**

1  stand up, turn around.
2    Q  So it is really you turn around --
3    A  Actually, you would be opening up your mouth
4  for the first time when you stand up and the wiggle
5  of your fingers, when you are in line with your back
6  on the wall. We do that first. We are already
7  looking at you.
8     MR. KANOVITZ: We will take a break.
9         (a brief recess was taken)
10    MR. KANOVITZ: Q  After the searchees put
11 their clothes back on, the shoes have been checked,
12 anything that they are not going to be allowed to
13 retain has been separated and pushed to the other
14 side of the line and they are told not to touch
15 that, what happens next?
16   A  I'm not sure. Did you say that their shoes
17 are back on or clothes are back on?
18   Q  Shoes and clothes back on.
19   A  We will ask them to come to the line, pick
20 up their shoes, step back to the wall and put their
21 shoes back on. When that is complete at that point
22 in time the officers basically stay in their
23 stations where they are at and the supervisor or the
24 officer at the desk now asks each inmate to step up

**201**

1  to him one at a time. He checks their hand to see
2  if they are minimum, medium, or maximum and we have
3  the holding cells or bull pens which is in that area
4  which is in that hallway after you leave out of here
5  across from there and adjacent to the doorway
6  leading into intake.
7        Those are designated by division. The
8  divisions are separated into minimum divisions,
9  medium divisions, and maximum divisions. And as the
10 officers sees that they are minimum, medium, or
11 maximum they tell them what bull pen to go into and
12 they are instructed to go in there.
13       When they get in all the bull pens out
14 there and out of the search area, they will be held
15 in that holding cell until the divisions come to
16 pick them up from the actual housing units.
17   Q  Is there an opportunity to make a phone call
18 at any point?
19   A  The whole time that the detainees are in the
20 intake area there are telephones in those bull pens.
21   Q  Are they on all the time?
22   A  Yes, any time that the intake process is
23 going on they are on.
24   Q  Are there phones in the bull pens next to